No. 13226

IN THE SUPREME COURT OF THE STATE OF MONTANA

1976

---

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

MERREL CLINE, L. R. BRETZ and
SHIRLEY CLINE,

Defendants and Appellants.

---

Appeal from: District Court of the First Judicial District,
Honorable W. W. Lessley, Judge presiding.

Counsel of Record:

For Appellants:

Moses, Kampfe, Tolliver and Wright, Billings, Montana
Charles Moses argued, Billings, Montana
W. William Leaphart argued, Helena, Montana

For Respondent:

Hon. Robert L. Woodahl, Attorney General, Helena,
Montana
John F. North argued, Assistant Attorney General,
Helena, Montana

---

Submitted: September 9, 1976

Decided: OCT 14 1976

Filed: OCT 14 1976

*Thomas J. Kearney*
Clerk

Mr. Justice Frank I. Haswell delivered the Opinion of the Court.

Defendants appeal from their convictions of the crime of obtaining money by false pretenses following jury trial in the district court of Lewis and Clark County before the Hon. W. W. Lessley, district judge presiding.

The prosecution arose out of a claim for Workmen's Compensation benefits in connection with the death of Wesley Wampole. Defendant Bretz, an attorney, prepared the claim for Wampole's widow, Nona, in which it was represented that Wampole died as a result of a severe strain suffered on January 8, 1973, while employed by Courtesy Mobile Homes. Courtesy was a corporation of which defendant Shirley Cline was president and defendant Merrel Cline, her husband, was manager. Mrs. Wampole signed the claim for compensation benefits but later and at the trial she stated that Wesley Wampole had not worked for Courtesy on that day and that defendant Bretz had made up the false claim to get money from the State Workmen's Compensation Insurance Fund.

Defendant Merrel Cline signed the Employer's First Report of Injury stating that Wampole had worked for Courtesy on January 8, and caused it to be filed with the Workmen's Compensation Division in Helena.

Mr. and Mrs. Stubbs who ran the Conrad, Montana office of Courtesy, gave a statement to the Workmen's Compensation Division that Wesley Wampole was working for Courtesy in Conrad on January 8. At the trial employees of Courtesy testified that Wesley Wampole had never worked for Courtesy; that defendant Merrel Cline told them to lie; that defendant Shirley Cline instructed that Wesley Wampole's name be entered on the payroll of Courtesy but that he was dead and no check would be issued.

Later the Workmen's Compensation Division entered into a "nonacceptance" settlement in the amount of $5,400 based on

information contained in the claim file of Wesley Wampole. The state settlement warrant was mailed to defendant Bretz' law office in Great Falls, Montana in February, 1974. Mrs. Wampole later received $2,700 by personal check from defendant Bretz pursuant to their fee arrangement without ever seeing the state settlement warrant.

The attorney general's office handled the investigation and prosecution of this case under a grant of authority from the state legislature. Section 79-2315, R.C.M. 1947.

On October 31, 1974, special assistant attorneys general Richard Dzivi and Al Wells filed a motion for leave to file an Information direct in the district court, Lewis and Clark County. This motion was granted and an Information was filed charging defendants Bretz and Merrel Cline in nine counts with the crimes of grand larceny, obtaining money and property by false pretenses, preparing false evidence, offering false evidence, and presenting false proof upon a policy of insurance. In the same Information defendant Shirley Cline was charged with one count of presenting false proof upon a policy of insurance.

Subsequently the case came on for trial on March 10, 1975; the jury was empaneled and sworn; and the trial was continued. On March 21 four counts were dismissed. Both the state and the defendants applied to this Court for a writ of supervisory control, which we denied.

On April 4 the state moved to dismiss the Information for the express and exclusive purpose of filing a new Information. The state's motion was granted and a new Information was filed charging all three defendants with two crimes: Count I charging the crime of grand larceny; and Count II charging the crime of obtaining money and property by false pretenses.

Subsequently the case came on for trial, a new jury was

empaneled and sworn, and the trial proceeded.  At the conclusion of all the evidence Count I charging grand larceny was dismissed by the court.  All three defendants were convicted by jury verdict of Count II, obtaining money by false pretenses.  All three defendants now appeal from the judgment of conviction.

Defendants have presented many specifications of error which we group in the following discussion.  Such further facts as appear necessary to an understanding of each specification of error will be set forth hereinafter.

The first specification of error is that the evidence is insufficient to support the conviction of defendant Shirley Cline.  She argues that under the instructions to the jury, proof that she received some of the settlement proceeds was necessary to convict and there was no evidence that she did.

The state offered its proposed instruction #4 setting forth the elements of the crime of obtaining money by false pretenses.  This instruction was given to the jury as Instruction No. 18:

> "Every person who knowingly and designedly, by false or fraudulent representation or pretenses, defrauds another person of money or property is guilty of obtaining money or property by false pretenses.
>
> "The elements of obtaining money or property by false pretenses are:
>
> "1.  That there was a making by the accused to the Workmen's Compensation Division of one or more representations of past events or existing facts; and
>
> "2.  That the Workmen's Compensation Division believed such representations to be true; and relying thereon, the Workmen's Compensation Division parted with its money or property <u>which accused received</u>.
>
> "3.  That such representations were false; and
>
> "4.  Were made knowingly and designedly with the intent to defraud the Workmen's Compensation

- 4 -

Division.

"If, after considering all of the evidence, you find that the prosecution has established beyond a reasonable doubt that the defendants acted in such a manner so as to satisfy all of the above elements at or about the date and place stated in the information, you should find the defendants guilty of obtaining money or property by false pretenses; if you do not so find, you should find the defendants not guilty." (Emphasis supplied.)

This instruction requires the state to prove beyond a reasonable doubt that Shirley Cline received part of the settlement proceeds. Although the state now argues on appeal proof that defendant Shirley Cline received a part of the settlement proceeds herself is unnecessary to convict, citing State v. Lagerquist, 152 Mont. 21, 445 P.2d 910, the above instruction requiring such proof became the "law of the case" and the jury was bound thereby. DeLeon v. McNinch, 146 Mont. 287, 407 P.2d 45; McDonald v. Peters, 128 Mont. 241, 272 P.2d 730; Wood v. Jaeger, 128 Mont. 235, 272 P.2d 725; Metcalf v. Barnard-Curtiss Co., 120 Mont. 50, 180 P.2d 263; Bowman v. Lewis, 110 Mont. 435, 102 P.2d 1; Ingman v. Hewitt, 107 Mont. 267, 86 P.2d 653.

There is a total absence of proof that defendant Shirley Cline received any part of the settlement proceeds. On the contrary all the evidence in the case indicates she did not. The undisputed evidence shows that the $5,400 state settlement warrant went to the law office of defendant Bretz and that Mrs. Wampole was paid $2,700. Defendant Shirley Cline testified that neither she nor her husband at any time received any money from either Mrs. Wampole or defendant Bretz as a result of the death claim for Wesley Wampole. Defendant Bretz testified that he at no time shared any legal fees with defendants Shirley Cline or Merrel Cline. Not one witness for either the state or the defendants testified that defendant Shirley Cline obtained any of the settlement proceeds.

- 5 -

The conviction of defendant Shirley Cline of the crime of obtaining money by false pretenses must be reversed for a total failure of proof of one of the elements of the crime as defined by Instruction No. 18. This renders unnecessary discussion of other specifications of error concerning defendant Shirley Cline.

The same situation exists concerning the conviction of defendant Merrel Cline of the crime of obtaining money by false pretenses. As pointed out in the brief of defendants Cline, "Regardless of what other activity Merrel Cline may or may not have engaged in, he cannot stand convicted of obtaining money by false pretenses unless the State proved beyond a reasonable doubt that he received money as a result of making false representations". This was required by Instruction No. 18.

The only reference to defendant Merrel Cline's receiving any money was the testimony of Mrs. Roane, an employee of Courtesy, that she was given $2,000 to deposit shortly after Merrel Cline returned from visiting defendant Bretz in Great Falls. The testimony shows that Mrs. Roane quit working for Courtesy in 1973 and that the $2,000 deposit was made in 1972. This was almost two years before the $5,400 state settlement warrant was issued in February, 1974. There is a total absence of evidence that defendant Merrel Cline received any of the settlement proceeds as required by Instruction No. 18.

Accordingly, the conviction of defendant Merrel Cline must be reversed for a total failure of proof of one of the elements of the crime of obtaining money by false pretenses as required by Instruction No. 18. This likewise renders unnecessary further discussion of other specifications of error concerning defendant Merrel Cline.

We now direct our attention to the conviction of defendant

Bretz of the crime of obtaining money by false pretenses. At the outset, he contends that the attorney general and his assistants had no authority to prosecute this case and therefore the conviction must be reversed.

Initially defendant Bretz argues that the attorney general's sole authority to prosecute is based on the legislative authorization contained in section 79-2315, R.C.M. 1947; that such authorization does not cover this case; and that any authorization granted the attorney general cannot be delegated by him to nonresident assistants not authorized to practice law in Montana.

Section 79-2315, R.C.M. 1947, provides:

"Attorney general shall prosecute. The attorney general shall conduct on behalf of the state, all prosecutions for public offenses disclosed by an audit of a state agency performed by the legislative auditor. If the attorney general shall decline such prosecution or shall fail to commence action on a public offense within a reasonable time the county attorney of the appropriate county shall conduct on behalf of the state such prosecution."

Defendant Bretz points out that the legislative auditor never investigated the contents of the Wesley Wampole file; that the charge in the instant case originated from a telephone call the attorney general's office received from a person who claimed he had received a threat from Merrel Cline for having fired his attorney on a workmen's compensation claim; and that the attorney general had no authority to prosecute an offense not disclosed by an audit performed by the legislative auditor.

We decline to construe or apply so narrowly the authority granted the attorney general by section 79-2315. The audit by the legislative auditor disclosed numerous apparent violations and public offenses in connection with workmen's compensation settlements from the state fund. The area of apparent criminal activities and public offenses was exposed by the legislative

- 7 -

audit of the Workmen's Compensation Division. Whether disclosure of the individual offense in question came about independent of, coincidental to, or as a result of information received by the attorney general in his ongoing investigations and prosecutions of criminal offenses exposed by the legislative audit in connection with workmen's compensation settlements from the state fund is immaterial. The statutory grant of authority covers "public offenses disclosed by an audit of a state agency by the legislative auditor" and does not require individual identification of a particular offense or a particular offender by the legislative auditor as a precondition to the attorney general's authority in such a manner as to defeat the obvious purpose of the legislation.

Defendant Bretz additionally contends that section 79-2315 cannot be applied retroactively to authorize the attorney general to prosecute crimes committed prior to such statutory grant of authority. Defendant Bretz refers us to section 12-201, R.C.M. 1947, which provides:

> "No law contained in any of the codes or other statutes of Montana is retroactive unless expressly so declared."

This Court has previously held that procedural laws may be given retroactive effect, notwithstanding section 12-201. Dunham v. Southside National Bank of Missoula, ____Mont.____, 548 P.2d 1383, 33 St.Rep. 372, and cases cited therein. Whether the attorney general or the county attorney prosecutes is simply a procedural matter, so section 12-201 is not applicable. The obvious purpose and intent of section 79-2315 was to give the attorney general authority to prosecute public offenses disclosed by the legislative audit of the Workmen's Compensation Division.

Defendant Bretz next argues the attorney general unlawfully delegated responsibility for the prosecution of this case

- 8 -

to special prosecutors not licensed to practice law in Montana. This refers to the part that nonresident prosecutors employed by the attorney general played in the prosecution of this case.

This Court has the exclusive power to determine who may practice law in Montana. Article VII, Section 2, Montana Constitution; Section 93-2005, R.C.M. 1947; In re Senate Bill No. 630 Relating to Bar Examination, 164 Mont. 366, 523 P.2d 484. This Court by order of February 24, 1975, specifically admitted Alfred A. Wells to the practice of law in Montana "to act as Special Assistant Attorney General in all matters concerning the investigation and prosecution of criminal offenses disclosed by the legislative auditor's audit of the Workmen's Compensation Division * * *."

The next specifications of error raised by defendant Bretz relate to alleged deficiencies in the Information charging the crime. He contends the State of Montana and its agencies cannot be the victims of grand larceny or obtaining money by false pretenses; that the crimes charged were violations of a repealed statute under the old criminal code; that charging the two crimes constitutes duplicitous pleading and additionally required an unlawful joinder of inconsistent and repugnant defenses; and the Information was fatally defective in failing to charge the place where the crime was committed.

We hold that the crimes of grand larceny and obtaining money by false pretenses can be committed against the state of Montana and its agencies under the old criminal code and that those crimes do not require that they be committed against a natural person or a corporation. The gravamen of the crime of grand larceny under the old criminal code is the intent to deprive or defraud the true owner of his, her, or its property. Section 94-2701, R.C.M. 1947. The victim, by statute, may be a body

politic.  Section 94-105, R.C.M. 1947, provided:

> "What intent to defraud is sufficient.  Whenever,
> by any of the provisions of this code, an intent
> to defraud is required in order to constitute
> any offense, it is sufficient if an intent appears
> to defraud any person, association, or body politic
> or corporate, whatever,"  (Emphasis added.)

The same is true of the crime of obtaining money by false pretenses.  Section 94-1805 defined this crime as applying to "Every person who knowingly and designedly, by false or fraudulent representation or pretenses, defrauds any other person of money or property" and did not require that the person defrauded be the owner of the property.  State v. Hanks, 116 Mont. 399, 153 P.2d 220.  Here, the Information charges "that the IAB/WCD and authorized representatives thereof believed and relied upon such representations and pretenses as true" and thus parted with the settlement money.  This is sufficient to charge the crime of obtaining money by false pretenses.

Defendant Bretz further argues that the crimes charged were violations of a repealed statute.  He contends that every necessary element of the crimes charged could only have been committed after January 1, 1974, after the statutes under which he had been charged had been repealed.  He points out that it does not make any difference when the fraud was prepared, but only when the fraud was acted upon in 1974.

This contention is fallacious.  It assumes that all elements of the crimes charged must be completed before January 1, 1974.  This is directly contrary to the controlling statute, Chapter 513, Section 33, 1973 Session Laws:

> "The Montana Criminal Code and all other provisions
> of this act are effective January 1, 1974, and shall
> apply to all offenses alleged to have been committed
> on or after that date.  The Montana Criminal Code
> and all other provisions of this act do not apply
> to offenses committed prior to its effective date
> and prosecutions for such offenses shall be governed
> by the prior law, which is continued in effect for
> that purpose, as if this act were not in force.
> For the purpose of this section, an offense
> was committed prior to the effective date of this act

                    if any of the elements of the offense
                    occurred prior thereto." (Emphasis added.)
Here the fraud, a necessary element of the crimes charged, was
committed in 1973 and the crimes were properly charged under the
old criminal code.

        Defendant Bretz argues that charging the two crimes con-
stitutes duplicitous pleading. He argues that the prohibition
against duplicity is designed to protect his right under the
Sixth Amendment to the United States Constitution to notice of
the nature and cause of the accusation against him so that he
might prepare a defense, and to guard against the possibility that
confusion as to the basis of the verdict may subject him to
double jeopardy in the event of a subsequent prosecution, citing
United States v. Tanner, 471 F.2d 128, cert.denied 409 U.S. 949,
93 S.Ct. 269, 34 L ed 2d 220.

        Here, the two offenses charged, grand larceny and obtain-
ing money by false pretenses, are but different legal theories
covering the same transaction. They are charged in the alterna-
tive as provided by statute, section 95-1504(a). The state did
not seek conviction on both counts, but was required to elect and
did elect to stand on Count II charging obtaining money by false
pretenses, at the conclusion of all the evidence. The defendant
knew what he was charged with doing and could prepare his defense.
This Court held in State ex rel. McKenzie v. District Court, 165
Mont. 54, 63, 525 P.2d 1211, that "The purpose of an information
is to inform the defendant of what he is charged, nothing more,
nothing less." There can be no double jeopardy under the alterna-
tive pleading in this case.

        Bretz further claims prejudice by requiring joinder of
inconsistent and repugnant defenses. This argument loses its
vitality where, as here, the alternative counts are simply dif-
ferent legal theories covering the same transaction. We have

                            - 11 -

previously upheld joinder of the crimes of grand larceny and receipt of stolen property, where pleaded alternatively and where the State sought conviction upon only one of the counts. State v. Tritz, 164 Mont. 344, 522 P.2d 603. Defendant Bretz' argument on this point is without merit.

Finally Bretz charges the Information is fatally defective in charging that the place where the crime was committed was in Lewis and Clark County and then failing to prove that Bretz committed a single act in that county.

One of the elements of the crimes charged is fraud in obtaining the state's settlement money. This occurred in Lewis and Clark County where the settlement money was disbursed. As this final element of the crimes occurred in Lewis and Clark County, it was proper to charge the crimes as committed there. There was no variance between pleading and proof.

Defendant Bretz next contends that the district court committed prejudicial error in refusing to hold a hearing on his motion for change of venue. He contends that Cascade County was the proper place of trial.

Either Lewis and Clark County or Cascade County is a proper place of trial because some of the elements constituting the offenses occurred in each county. Such being the case, the action must remain in the county where the charges were originally filed, here Lewis and Clark County. State v. Bretz, 166 Mont. 444, 534 P.2d 496. Bretz could not prevail on his motion for change of venue, so the district court committed no error in summarily denying it without holding a hearing.

One of defendant Bretz' principal contentions is that "the massive long-time publicity on this defendant and relating to this case has been so prejudicial" that he could not receive a fair trial. In the event the case was not dismissed on this basis, he

moved for a continuance "until such time as the effects of such massive long-time publicity against him have diminished".

The principal objection of defendant Bretz concerned a press conference called by the attorney general for all news media on September 18, 1974, in Helena, Lewis and Clark County, Montana. At this news conference the attorney general submitted a three page document entitled "Rejection" stating in substance that more than 35 counts of criminal violations of section 93-2108, R.C.M. 1947 (solicitation of clients by an attorney through employment of "runners") involving defendants Bretz and Merrel Cline during 1970-1972 could not be prosecuted because of the one year statute of limitations on misdemeanors contained in section 94-5703, R.C.M. 1947. The document further stated that Special Assistant Attorney General Donald N. Eastman had "overwhelming evidence and documentation which clearly and unimpeachably demonstrates" that Merrel Cline and others were employed as runners for Attorney L. R. Bretz of Great Falls, Montana, during the years 1970-1972. It further stated that the "dimensions of this illegal and patently unethical course of conduct, combination, and collusion are repugnant."

The "Rejection" further stated that reports of interviews of workmen's compensation claimants "flatly demonstrate" that the "runners" were soliciting workmen's compensation business for an attorney and were being paid for it; that "direct witness evidence" from claimants that came to be retained by said attorney as a result of a direct solicitation by a runner appears in at least 38 claims, listed by file number. It then stated that employing runners to solicit law clients by an attorney is a violation of Montana statutory standards of conduct for lawyers, an unethical practice for attorneys, and is grounds for disbarment from the practice of law, setting forth the applicable statutes. This

statement thereafter appeared in the "Rejection":

> "Therefore, it can be plainly concluded that the
> above-named runners, Attorney Bretz and others
> committed criminal offenses during 1970, 1971,
> and 1972 by soliciting claimants in Workmen's
> Compensation cases to hire Attorney Bretz. The
> above 37 (sic) listed case numbers are but a
> sampling of the occasions when this occurred."

The document then went on to cite the statute of limitations, observing that "Running, capping, solicitation, ambulance-chasing for attorneys---however it is named---is a universal problem. It is the scourge of the responsible legal profession, and perilous to society and those clients solicited." It then indicated that in many states these practices can be prosecuted as felony conspiracies with extended limitation periods; that currently ambulance-chasing rings are under indictment and being prosecuted for conspiracy in many parts of the United States; but unfortunately Montana conspiracy statutes are inadequate to deal with this aggravated problem.

The document continued with the observation that although "This matter cannot now be handled at the criminal plateau because of the statute of limitations." the attorney general's special investigators "have been instructed to conduct an even more sophisticated probe to look for evidence of felony fraud by these runners."

The document concluded with the statement "The matter will be referred to the Commission on Practice of the Montana Supreme Court for their independent evaluation of possible administrative violations."

Bretz also complains of inappropriate comments by the attorney general at this news conference; a front page story in the Billings Gazette concerning a civil action where he and his wife were defendants in a $54,000 damage suit "charging fraud in the sale of a dying horse to a minor" with a concluding paragraph

stating "Bretz is also charged by the state with a total of 60 felony counts in two counties on charges relating to the Workmen's Compensation Division affair."; and numerous unidentified press conferences by the state concerning the three defendants in this case and the resulting coverage in the press, radio and television.

At the outset we observe that the attorney general's news conference and "Rejection" was held on September 14, 1974, about 9 months prior to trial of this case which commenced on June 16, 1975. Bretz has not attempted to prove actual prejudice or any specific difficulty in choosing a jury. There is nothing in the record before us indicating that any member of the jury or prospective juror had knowledge of the attorney general's "Rejection", comments, or the ensuing publicity. Instead Bretz relies on the contention that there was such a high probability that prejudice would result that the whole prosecution in this case was inherently lacking in "due process".

Defendant Bretz cites a number of federal cases wherein charges were dismissed because of inherent, as distinguished from actual or demonstrated, prejudice. They all involve very extreme situations. We do not pretend to condone the publicity actions of the prosecution, but the facts here fall short of the type of situations involved in the federal cases. We will briefly distinguish them on the facts.

The case of Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L ed 2d 543, involved the nationally publicized trial of Billie Sol Estes. Pretrial hearings in that case and portions of the trial were carried live over radio and television. Eleven volumes of press clippings were on file with the clerk of court. Pictures of witnesses, jury members, counsel, and defendant were broadcast on the nightly television news. The ever present cameras could

not be ignored. The Court sets forth the extra-judicial influences that could readily affect the jury and the judge.

In Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L ed 2d 663, a confession of defendant to bank robbery, kidnapping, and murder was recorded live on film with sound and was telecast showing defendant in jail with two state troopers and the sheriff asking leading questions. To the viewing public this would appear to be his trial of guilt.

The case of Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L ed 2d 424, did not involve publicity but rather was reversed because two deputies who had investigated the crime and were principal prosecution witnesses were also in care of the sequestered jury. They transported the jury to and from court and had meals with them. They were in close contact with them and could have discussed the case.

In the instant case the situation is not analogous in our view. A substantial length of time intervened between the attorney general's press conference and the time of trial. The publicity did not approach the volume nor the continuity of Estes. The subject of the press conference did not concern the charges upon which Bretz was tried in this case. No confessions were involved and no showing of interviews with defendant Bretz were made as in Rideau. No sequestered jury in charge of principal prosecution witnesses is presented as in Turner. The situation in the instant case falls short of such inherent prejudice as to deny defendant Bretz "due process" in his trial for the two crimes with which he was charged.

The other matters mentioned lack specificity with one exception. The news item in the Billings Gazette is simply a news report of a damage suit filed against defendant Bretz, the concluding paragraph simply is a report of pending criminal

- 16 -

charges filed against him. The remaining matters are so lacking in identification, time of occurrence, and specificity that we are unable to assess their import.

Another principal specification of error is Bretz' contention that double jeopardy bars his prosecution and conviction in the instant case. He argues that the "double jeopardy" provisions of the United States Constitution prohibit the dismissal and refiling of the two charges against him after the jury had been empaneled and sworn to try the original charges. We have held to the contrary in State v. Cunningham, 166 Mont. 530 , 535 P.2d 186, 32 St.Rep. 433. The United States District Court for Montana has denied the "double jeopardy" claim now raised by Bretz. Bretz v. Crist, 33 St.Rep. 13. An appeal from the latter decision is now pending before the Court of Appeals for the Ninth Circuit in San Francisco. Unless and until this issue is finally resolved by a contrary decision of a higher federal appeals court, we stand on the decisions in Cunningham and Bretz.

Defendant Bretz next contends the giving of an instruction to the jury during the course of their deliberation constitutes reversible error in that it tends to coerce the minority of jurors to agree with the majority for the sake of reaching a verdict. Bretz claims that he has a right to a deadlocked jury.

The instruction reads:

"INSTRUCTION No. ___

"Ladies and Gentlemen of the Jury:

"When the trial of this cause began more than two weeks ago you were selected from a possible jury panel of 87 jurors. The questioning was long, varied and searching on behalf of both the State and all the defendants. As a result of that voir dire and after exercising 36 preemptory challenges you were the chosen 12 to decide this case.

The judicial process assigns tasks to the various units.  It is the task of the witnesses to testify truthfully as they recall the facts. It is the task of the lawyers to prepare the case for final submission to the trier of the facts, the jury.  It is the task of the Judge to preside, instruct you as to the law and to rule on the admissibility of the evidence.  It is the task of the jury to decide the case.  Scores of exhibits, lengthy and complete, and many witnesses have been presented to you in the course of this trial which has lasted beyond two weeks.  The ultimate responsibility of the jury is to render verdicts in this cause.  You are not partisan nor are you advocates in this matter but you are the judges; you are the only judges of the facts; it is you and you alone that can render verdicts in this cause.  There is no reason to believe that any other 12 men and women would possess any more ability, intelligence and courage to do the ultimate task assigned to a jury under the American system of justice.

"The final test of the quality of your service will be in the verdicts which you return to this Court. It is only by rendering verdicts in this cause that you can make a definite contribution to efficient judicial administration as you arrive at just and possible verdicts.  We have never asked, as a matter of fact we have instructed you, that you should not surrender your honest convictions in this matter for the mere purpose of returning a verdict or solely because of the opinion of other jurors, but this does not mean that you should avoid a task assigned to you of rendering verdicts in this cause."

Bretz objected to this instruction as follows:

"MR. MOSES:  On behalf of Mr. Bretz, we object to the Court's proposed instruction to the jury, a copy of which we have received, to be given during the time of the deliberation of the jury.  Our objections are specifically as follows: Number one, that instructions as to what the law is, or what their duties are, should not be given to the jury during the course of its deliberations.  Secondly, that the giving of such instruction may create undue prominence to any particular phase of the law and the jury may single out this particular instruction for guidance when the rule is that the jury cannot in fact single out any instruction but that all instructions should be read together and as a whole.  Thirdly, there is an impression left by this particular instruction that the jury should take into account the judicial process of selection of jurors, and the whole system rather than as having some bearing upon the question of whether a jury should be pressured into reaching a verdict in this particular case.  Accordingly it is my judgment and I may say to the Court that it has always been my opinion-I object to any instruction given to the jury during deliberation."

The case had been submitted to the jury at 12:40 p.m. on June 30, 1975, after approximately a two week trial. The jury continued its deliberations until about 1:00 a.m. on July 1. The jury foreperson, Mrs. Cummins, then indicated to the judge that the jury had not reached a verdict and she did not know whether the jury could reach one after a good night's sleep. The judge sent the jury to bed for the night and it came back into court at 10:00 a.m. the following morning.

The testimony of defendant Shirley Cline and Mr. Nicolls was reread to the jury at its request. Then the above quoted instruction was given. The jury retired to continue its deliberations and returned to court at 2:30 p.m. with its verdict.

We do not consider the above quoted instruction objectionably coercive. It does not single out the minority juror and ask him to reexamine his views for the purpose of reaching a verdict, a practice this Court found objectionable in State v. Randall, 137 Mont. 534, 353 P.2d 1054. It is not a traditional charge of the type set forth in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L ed 528, which tends to coerce a dissenting juror into examination of his opinion with respect to reasonable doubt and which has been condemned by this Court. State v. Randall, supra. It is not an instruction to the jury to continue its deliberations until they reach a unanimous verdict as in Fields v. State, Alaska 1971, 487 P.2d 831, nor a statement by the judge that "You have got to reach a decision in this case.", as in Jenkins v. United States, 380 U.S. 445, 85 S.Ct. 1059, 13 L ed 2d 957, 958. Unless we are to outlaw any instruction to the jury during the course of its deliberations, a view we do not entertain, it is difficult to draw a more innocuous instruction. We find no error in giving this instruction.

Bretz next contends that the admission of state's Exhibit #2 (the state settlement warrant for $5,400) was error. His contention is that no sufficient foundation was laid for its admission in that there was no showing who made the endorsement, under what circumstances the endorsement was made, and that the endorsement was not connected up with one or more of the defendants.

We hold that the warrant was properly admitted in evidence under the Uniform Business Records as Evidence Act, section 93-801-2, R.C.M. 1947, providing:

> "A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

The foundation showed the settlement warrant had been prepared in the regular course of business of the Workmen's Compensation Division; it was certified as the settlement warrant in question; and the testimony showed it was mailed to defendant Bretz. Identification of the endorser's signature is not required as a precondition to admissibility, as it is no less a business record regardless of who endorsed it. Identification of the endorser's signature goes to the weight of the evidence, not its admissibility. [See Wharton's Criminal Evidence, 12th ed. V. 1, §269, pp. 610, 611, for limitations on admissibility of documents under the Uniform Business Records As Evidence Act.]

Bretz finally contends the district court improperly allowed state's witness Lester Jones to testify concerning his conversation with Wesley Wampole in Dillon, Montana on January 3, 1973 and later on that day during a ride to Great Falls. Bretz contends the statements were hearsay, did not fall under any

exception to the hearsay rule, and admission in evidence was reversible error.

The gist of the conversation was that Wesley Wampole told the witness he had terminated his present employment and Wampole and the witness had arrived at a tentative agreement that Wampole would go to work for him.

The significance of this testimony, according to Bretz, is that it tended to show that Wesley Wampole did not ever work for Courtesy and this was a vital part of the prosecution's proof. The state contends the conversation was not introduced to prove the truth of the assertions, but only to show Wampole's state of mind.

We hold the testimony inadmissible hearsay. Wampole's state of mind on January 3 was not material to any issue in the case. However the admission of the statement was harmless error. Section 95-2425, R.C.M. 1947, provides:

> "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded. * * *"

See also section 95-2412, R.C.M. 1947, to the same effect.

The fact that Wesley Wampole had never worked for Courtesy was established independently by testimony of Wampole's widow, Nona, that Wampole had not worked for Courtesy on January 8; and by the testimony of various employees of Courtesy that Wampole had never worked there. The objectionable hearsay is simply cumulative testimony on the point. Cumulative testimony has been held harmless error where, as here, the fact in question is well established by admissible testimony. Keller v. Safeway Stores, Inc., 111 Mont. 28, 108 P.2d 605; In re Spoya's Estate, 129 Mont. 83, 282 P.2d 452.

We have considered the other specifications of error in the briefs of defendant Bretz. None would change our decision

- 21 -

herein.  Discussion of each in this Opinion is unwarranted in our view.  We have discussed the principal specifications of error raised by defendant Bretz with the reasons for our rulings on each.

The conviction of defendant Bretz is affirmed.  The convictions of defendant Merrel Cline and defendant Shirley Cline are reversed and the charges against each dismissed.

_____
                  Justice

We concur:

_____
Chief Justice

_____
Justice

_____
Hon. Robert Sykes, District
Judge, sitting in place of Mr.
Justice Gene B. Daly.